# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE,      )
             )
     Plaintiff,      )
             )
             )
     v.      )      Cr. ID. No. 1507018423A & B
             )
             )
GARY PERKINS,      )
             )
     Defendant.      )

Submitted: December 19, 2022
Decided: March 23, 2023

## COMMISSIONER'S REPORT AND RECOMMENDATION THAT DEFENDANT'S MOTION FOR POSTCONVICTION RELIEF SHOULD BE DENIED AND POSTCONVICTION COUNSEL'S MOTION TO WITHDRAW SHOULD BE GRANTED

Carolyn S. Hake, Esquire, Deputy Attorney General, Department of Justice, Wilmington, Delaware, Attorney for the State

Patrick J. Collins, Esquire, and Kimberly A. Price, Esquire, Collins & Associates, Wilmington, Delaware, Postconviction Attorneys for Defendant Gary Perkins

Anthony A. Figliola, Jr. Esquire, Wilmington, Delaware, Trial Attorney for Defendant Gary Perkins

SALOMONE, Commissioner

This 23rd day of March 2023, upon consideration of Gary Perkins' ("Defendant" or "Perkins") Motion for Postconviction Relief, it appears to the Court as follows:

## BACKGROUND AND PROCEDURAL HISTORY

Perkins was arrested on July 23, 2015 in connection with the murder of Jaime Murphy.[1] On October 26, 2015, he was indicted for Murder First Degree, Possession of a Deadly Weapon During the Commission of a Felony ("PDWDCF"), Possession of a Deadly Weapon by a Person Prohibited ("PDWBPP"), and Criminal Contempt.[2] On January 19, 2017, the Defendant filed a motion to sever the PDWBPP and criminal contempt charges from the Murder First Degree and PDWDCF charges.[3] The Court granted the motion on May 11, 2017.[4]

Trial commenced on the charges of Murder First Degree and PDWDCF (the "A" case) on October 23, 2017.[5] Following a four-day trial, on October 26, 2017, a Superior Court jury convicted Perkins of both charges for his role in the stabbing

---

[1] Delaware Superior Court Docket, ID No. 1507018423A at 1 (hereinafter, "DI __") (Affidavit of Probable Cause, July 23, 2015).

[2] DI 3.

[3] DI 32.

[4] DI 47.

[5] DI 66.

death of Jaime Murphy.[6]  After the jury's verdict, the Court conducted a bench trial on the severed charges of PDWBPP and criminal contempt (the "B" case) and found the Defendant guilty of both charges.[7]  On January 25, 2018, the State filed a motion to declare Perkins a habitual offender pursuant to 11 *Del. C.* § 4214(a) for the PDWBPP conviction, which was granted by the Court prior to sentencing on March 9, 2018.[8]  Thereafter, the Superior Court sentenced Perkins to be incarcerated for his natural life plus an additional 36 years.[9]  The Delaware Supreme Court affirmed his conviction and sentence on appeal.[10]

On March 12, 2019, Perkins filed a *pro se* motion for postconviction relief and accompanying motion for the appointment of counsel pursuant to Superior Court Criminal Rule 61 ("Rule 61").[11]  On May 6, 2019, Perkins filed a second *pro se* motion for postconviction relief, raising virtually identical claims as set forth in his

---

[6] DI 73.

[7] Delaware Superior Court Docket, ID No. 1507018423B at 13 (hereinafter, "DI(B) __ ").

[8] DI(B) 16, 18.

[9] DI 79 (Transcript of Sentencing, March 9, 2018 at 16-17).

[10] *Perkins v. State*, 2019 WL 327959 (Del. Jan. 23, 2019).  Counsel raised only one issue on direct appeal, claiming that the outburst from the gallery during opening statements was so prejudicial that it should have resulted in a mistrial.  DI 117-118 (Appendix to Memorandum in Support of Motion to Withdraw at 786-796) (All references to the Appendix provided by Rule 61 Counsel are hereinafter referred to as "A___").

[11] DI 90-91.

first motion, and reiterated his request for the appointment of counsel.[12] On June 19, 2019, the Court granted the motion for appointment of counsel.[13]

Having found no meritorious grounds for relief, Rule 61 counsel filed a motion to withdraw on February 19, 2021.[14] Perkins requested a continuance on March 3, 2021 to more fully prepare his response to the motion to withdraw, which the Court granted on March 11, 2021.[15] On April 21, 2021, Perkins filed a request for substitute counsel and/or an extension of time to respond, which extension was granted by the Court on April 26, 2021.[16] On May 23, 2021, Perkins filed responses to the motion to withdraw.[17] On July 27, 2021, Perkins' trial and appellate counsel responded to the allegations of ineffective assistance of counsel asserted by the Defendant.[18] Thereafter, in August 2021, Perkins filed a series of letters and

---

[12] DI 95-96.

[13] DI 98.

[14] DI 116-118.

[15] DI 119-121.

[16] DI 126-127.

[17] DI 128.

[18] DI 130.

supporting documentation with the Court in support of his responses to the motion to withdraw.[19]

The State filed its response to counsel's motion to withdraw and Perkins' claims of ineffective assistance of counsel on August 27, 2021.[20] The record was then further expanded to allow counsel who had withdrawn prior to the case going to trial to respond to the allegations of ineffective assistance of counsel, which affidavit was filed on December 10, 2021.[21] Thereafter, Perkins filed numerous motions with the Court requesting, among other things, (i) extensions of time to file his reply, (ii) a stay of all proceedings, (iii) an evidentiary hearing and (iv) the appointment of substitute Rule 61 counsel.[22] The Court stayed the proceedings until November 30, 2022 to allow Perkins adequate time to retain substitute Rule 61

---

[19] DI 131, 133, 135, 136, 137. On August 2, 2021, a letter dated July 27, 2021 from Perkins was filed with the Court in which Perkins indicated that his letter dated May 23, 2021 to Rule 61 counsel, Patrick Collins, Esq., was not his "actual" Motion for Postconviction Relief but rather a letter to Mr. Collins that he drafted hoping Mr. Collins would review it and see that his claims "had merit, rearticulate them and properly substantiate and submit them." DI 131. Despite his objection to the May 23, 2021 letter being forwarded to the Court, Perkins makes a number of assertions in his letter which are considered and addressed by the Court for completeness.

[20] DI 138-139.

[21] DI 143-44. Eugene Maurer, Jr., Esq. served as counsel to the Defendant before the Court granted his motion to withdraw on January 23, 2017. *See* DI 36. The State was permitted to supplement its response to Rule 61 counsel's motion to withdraw and Defendant's ineffective assistance of counsel claims after Mr. Mauer filed his affidavit responding to the ineffective assistance of counsel claims, but Mr. Maurer's affidavit did not prompt any further briefing by the State and by letter dated January 5, 2022 the State indicated it was relying on its filing from August 27, 2021. DI 145.

[22] DI 148, 149, 150, 152-157.

counsel.[23]  Having failed to retain substitute Rule 61 counsel in the allotted time, Perkins filed his *pro se* brief in support of his Motion for Postconviction Relief and in opposition to Rule 61 counsel's motion to withdraw on November 22, 2022, with related documents being filed on December 16, 2022 and December 19, 2022, respectively.[24]

## RELEVENT FACTS

On the morning of July 23, 2015, the body of Jamie Murphy was found on top of the slide platform in the playground area of Canby Park.[25]  She had been stabbed 30 to 40 times in the face, neck and chest areas and the wounds had produced such heavy blood loss that it flowed down the slide and puddled underneath it.[26]  Likewise, the surrounding playground equipment was smeared and spattered with her blood.[27]  Adjacent to her body on the slide platform, the police found a purse containing her photo ID and a green grocery bag.[28]  In addition, two McDonald's

---

[23] DI 161.

[24] DI 167, 169, 172-173.

[25] A230-33, A236-38, A248-49, A289.  Canby Park is located in Wilmington, DE.  All referenced locations contained herein are to various places and establishments in and around the City of Wilmington.

[26] A438, A448-49, A237, A268-71.

[27] A268-71, A278-84, A530-34, A540-41.

[28] A267-68, A287-89.

cups were found near Ms. Murphy's body.[29]  The evidence implicating Perkins in Ms. Murphy's death quickly mounted.

Surveillance video retrieved by police from the McDonald's located in Elsmere near Canby Park showed Jamie Murphy and the Defendant purchasing two drinks at the restaurant on the evening of July 22, 2015 around 7:30 p.m.[30]  The video also showed Perkins carrying a green grocery bag consistent with the bag found at the scene.[31]  The police also procured surveillance video from the McDonald's located on 4th Street in the early morning hours of July 23rd which showed the Defendant wearing orange sweatpants and speaking to an associate by the name of Thomas Underwood.[32]

Underwood advised the police that he had spoken to Perkins (who he referred to as "G") the day before Jamie Murphy was killed and stated that Perkins was angry with Ms. Murphy because he believed that she had given him a venereal disease.[33]  Perkins also told Underwood that if she had given him a venereal disease that he was

---

[29] A275-78, A291-92, A573.

[30] A298-03, A573-75.

[31] A298-301 (*See* State Exhibit 5).

[32] A314, A577 (*See* State Exhibit 7)

[33] A310-14, A317, A321, A576.  Underwood met Perkins through a mutual friend named Ellis Whiteman, who is known as "Jimmy."  A310.

going to beat her up or kill her.[34]  Underwood also confirmed that he saw Perkins again on the morning of July 23rd at the McDonald's on 4th Street.[35]  At that time, Perkins admitted to Underwood that he had seen Ms. Murphy the night before on the bus.[36]  Underwood also observed blood stains between Perkins' fingers and thumb and told the police that the Defendant always carried a pocketknife.[37]

Perkins was also seen on the morning of July 23rd by a Wilmington police officer while wearing bright orange sweatpants.[38]  The officer knew Perkins from prior contact and was aware that he was in a relationship with a white female named Jaime.[39]  However, he did not stop Perkins because he was unaware of the murder at that time.[40]

Later that day, when the officer learned that Perkins was a suspect in the death of Ms. Murphy, he located Perkins at a bus shelter at the intersection of 10th and King Streets.[41]  As the officer approached, Perkins tried to hide among the people in

---

[34] A312-13, A317.

[35] A311-13, A576.

[36] A312.

[37] A311-12, A331-332, A576.

[38] A350.

[39] A347-48, A355.

[40] A356.

[41] A350-52, A356-57.

the shelter but was nevertheless taken into custody.[42]  As he was patted down, the police noticed that Perkins was wearing a pair of blue sweatpants underneath his orange sweatpants.[43]  After pulling the orange sweatpants partially down, police saw that the blue sweatpants were covered in blood.[44]  Inside the pocket of the blue sweatpants was fresh blood and a pen knife.[45]

The clothing worn by Perkins at the time of his arrest was collected by the police.[46]  The inventory taken included a surfboard keychain with a small knife that had a blade of approximately two inches, both of which appeared to have dried blood on them.[47]  The police also found blood on Perkins blue sweatpants, grey long-sleeved shirt, blue short-sleeved shirt, and Timberland boots.[48]  The blood on both the sweatpants and boots appeared to be spattered, indicating he was likely at the scene when the stabbing occurred.[49]

---

[42] A352-54, A357-58.

[43] A352-53.

[44] A353.

[45] A353.

[46] A361.

[47] A361-62, A401, A414-15, A577

[48] A405-11.

[49] A536-37, A546-47, A550-53. A557, A590.

After being read his *Miranda* rights, Perkins agreed to speak with the police.[50] Perkins initially denied seeing or speaking with Jamie Murphy for several weeks but when confronted with the fact that the police had video footage of him at McDonald's with her, he admitted he had seen her on the evening of July 22, 2015.[51] Perkins claimed the two parted ways after leaving McDonald's and that he spent the night in the 10th Street Park.[52] Perkins also told police that he had gotten a rash after having sex with Ms. Murphy the week before and had gone to the hospital to be tested for a venereal disease.[53] Medical records confirmed that Perkins was examined at Christiana Hospital for a sexually transmitted disease on July 21, 2015.[54]

Perkins' clothing as well as the evidence found at the crime scene were tested for DNA evidence.[55] One of the McDonald's cups found on the playground had Ms. Murphy's fingerprints and DNA on it and the other cup had Ms. Murphy's and the Defendant's DNA on it.[56] The blood from Perkins' grey long-sleeved shirt produced

---

[50] A131-72.

[51] A143-45, A158, A160.

[52] A146, A161.

[53] A136, A150-54, A157-58.

[54] A583-84.

[55] A473.

[56] A412-13, A478, A482-83.

a mixed DNA profile of at least two individuals from which the Defendant was excluded but Ms. Murphy was included.[57]  Likewise, the blood from Perkins' blue sweatpants and left boot produced mixed DNA profiles of at least two individuals with Ms. Murphy being the major contributor.[58]  The blood on the blade of the knife taken from Perkins' pocket at the time of his arrest and the blood found on one of his boots also produced a single source profile that was consistent with Ms. Murphy's DNA.[59]  The knife handle swab also produced a mixed DNA profile from which Ms. Murphy was excluded but Perkins was a possible contributor.[60]

In addition to the DNA evidence, the State retained a private forensic consultant and blood stain pattern analyst who performed a pattern analysis on the physical evidence and looked for blood-like stains.[61]  The consultant observed a stain on the blue sweatpants that correlated with the DNA report.[62]  Similarly, the consultant identified blood on the orange sweatpants, although those pants were not

---

[57] A485-89.

[58] A485-89

[59] A478-81.

[60] A484.

[61] A523-524.

[62] A546-47.

specifically tested for DNA and blood.[63]  And, the medical examiner confirmed that Ms. Murphy's death was the result of the multiple stab wounds to her neck, which he opined were caused by a sharp object consistent with the knife found on Perkins at the time of his arrest.[64]

Perhaps the most damning of all the evidence presented at trial was the recording of the 911 call made from the victim's cell phone at 4:01 a.m. on July 23, 2015, which call captured the killing of Jaime Murphy.[65]  As the 911 operator attempted to engage the caller, gasping, moaning and wheezing could be heard on the open line as well as a male voice saying, among other things, "die bitch," "this is the last fucking day here," "But now you got what you want. Close your eye.  I told Jim I was gonna kill your mother fucking ass," and "don't fuck with G."[66]  The male voice can also be heard saying "You dying right now" and "You ain't living no God damn more."[67]  Perkins' probation officer, who knew Perkins from speaking

---

[63] A554-55.

[64] A437, A449-54.

[65] A173-75, A366-69, A372-73, A717 (*See* State Exhibit 108).

[66] A173-75.

[67] A174.

with him both in person or by phone on a weekly basis, identified the Defendant as the mail voice on the 911 call.[68]

## APPLICABLE LAW FOR POST CONVICTION RELIEF

**Rule 61 and Procedural Bars to Relief**

Rule 61 governs the procedures by which an incarcerated individual may seek to have his conviction set aside on the ground that the court lacked jurisdiction or any other ground that is a sufficient factual and legal basis for a collateral attack upon the conviction.[69]  That is, it is a means by which the court may correct Constitutional infirmities in a conviction or sentence.[70]  "Rule 61 is intended to correct errors in the trial process, not allow defendants unlimited opportunities to relitigate their convictions."[71]

Given that intent, before considering the merits of any claims for postconviction relief, the Court must first determine whether there are any procedural bars to the Rule 61 Motion.[72] Rule 61(i) establishes four procedural bars

---

[68] A392-96.  The probation officer was not, however, identified to the jury as Perkins' probation officer.

[69] Super. Ct. Crim. R. 61(a)(1).

[70] *Harris v. State*, 410 A.2d 500 (Del. 1970).

[71] *Ploof v. State*, 75 A.3d 811,820 (Del. 2013).

[72] *Younger v. State*, 580 A.2d 552, 554 (Del. 1990).

to postconviction relief.[73] Rule 61(i)(1) requires that a motion for postconviction relief must be filed within one year of a final judgement or conviction.[74] Rule 61(i)(2) bars successive motions for postconviction relief unless certain conditions are met.[75] Pursuant to Rule 61(i)(3) and (4), any ground for relief that was not previously raised is deemed waived, and any claims that were formerly adjudicated, whether in the proceedings leading to the judgment of conviction, in an appeal, in a postconviction proceeding, or in a federal habeas corpus proceeding, are thereafter barred.[76] However, ineffective assistance of counsel claims cannot be raised at any earlier stage in the proceedings and are properly presented by way of a motion for postconviction relief.[77]

---

[73] Super. Ct. Crim. R. 61(i)(1)-(4).

[74] Super. Ct. Crim. R. 61(i)(1).

[75] Rule 61(i)(2) bars successive or subsequent motions for postconviction relief unless the movant is able to "pled with particularity" that (i) "new evidence exists that creates a strong inference that the movant is actually innocent in fact of the acts underlying the charges of which he was convicted" or (ii) "a new rule of constitutional law, made retroactive to cases on collateral review by the United States Supreme Court or the Delaware Supreme Court, applies to the movant's case and renders the conviction or death sentence invalid." Super. Ct. Crim. R. 61(d)(2).

[76] *See* Super. Ct. Crim. R. 61(i)(5) and (d)(2)(i), (ii).

[77] *Sabb v. State*, 2021 WL 2229631, at *1 (Del. May 28, 2021); *Green v. State*, 238 A.3d 160, 187-188 (Del. 2020); *Whittle v. State*, 2016 WL 2585904, at *3 (Del. Apr. 28, 2016); *State v. Evan-Mayes*, 2016 WL 4502303, at *2 (Del. Super. Aug. 25, 2016).

This is Defendant's first motion for postconviction relief and it was timely filed.[78] No procedural bars prevent the Court from considering his ineffective assistance of counsel claims on the merits but procedural bars do exist with respect certain of his claims.

**Ineffective Assistance of Counsel Claims**

In order to prevail on a claim of ineffective assistance of counsel, the defendant must satisfy the two-prong standard set forth in *Strickland v. Washington.*[79] This test requires the defendant to show: (a) counsel's deficient performance, *i.e.*, that his attorney's performance "fell below an objective standard of reasonableness,"[80] and (b) prejudice.

The first prong requires the defendant to show by a preponderance of the evidence that defense counsel was not reasonably competent.[81] Judicial scrutiny under the first prong is highly deferential. Courts must ignore the distorting effects of hindsight and proceed with a strong presumption that counsel's conduct was reasonable.[82] The *Strickland* Court explained that a court deciding an actual

---

[78] *See* Super. Ct. Crim. R. 61(i)(1) (motion must be filed within one year of when conviction becomes final); Super. Ct. Crim. R. 61(m)(2) (If the defendant files a direct appeal, the judgment of conviction becomes final when the mandate is issued).

[79] *Strickland v. Washington,* 466 U.S. 668 (1984).

[80] *Id.* at 688.

[81] *Id.* at 687-88, 694.

[82] *Id.* at 689.

ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.[83]

Under the second prong, in order to establish prejudice, the movant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome."[84] In other words, not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding.[85] The court must consider the totality of the evidence and must ask if the movant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.[86] "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."[87]

The burden of proving ineffective assistance of counsel is on the defendant.[88] Mere allegations of ineffectiveness or conclusory statements will not suffice;

---

[83] *Id.* at 690.

[84] *Id.* at 694.

[85] *Id.* at 693.

[86] *Dale v. State,* 2017 WL 443705, * 2 (Del. 2017); *Strickland v. Washington,* 466 U.S. 668, 695-696 (1984).

[87] *Cooke v. State*, 977 A.2d 803, 840 (Del. 2009) (quoting *Strickland*, 466 U.S. at 686).

[88] *Oliver v. State,* 2001 WL 1751246 (Del.).

instead, a defendant must make and substantiate concrete allegations of actual prejudice.[89] The court must be persuaded that the alleged errors were so serious that counsel was not functioning as the "counsel" guaranteed to the defendant by the Sixth Amendment.[90] The test is not whether the defendant can demonstrate that the error had some "conceivable effect" on the outcome but rather whether the error undermined the reliability of the result of the proceeding.[91]

Although not insurmountable, the *Strickland* standard is highly demanding and leads to a strong presumption that counsel's conduct fell within a wide range of reasonable professional assistance.[92] Moreover, there is a strong presumption that defense counsel's conduct constituted sound trial strategy.[93]

The *Strickland* test applies equally to the performance of appellate counsel.[94] Importantly, appellate counsel is not constitutionally required to raise all possible issues on appeal.[95] "A defendant can only show that his appellate counsel

---

[89] *Younger v. State*, 580 A.2d 552, 556 (Del. 1990).

[90] *State v. Gonzalez,* 2019 WL 1762976, *1 (Del.).

[91] *Id.*

[92] *Albury v. State*, 551 A.2d 53, 59 (Del. 1988); *Salih v. State*, 2008 WL 4762323, at *1 (Del. 2008).

[93] *Strickland,* 466 U.S. at 689 (1984).

[94] *Flamer v. State*, 585 A.2d 736, 753 (Del. 1990).

[95] *Neal v. State*, 80 A.3d 938, 946 (Del. 2013).

ineffectively represented him where the attorney omits issues that are clearly stronger than those the attorney presented" on appeal.[96] Even where a defendant is successful in demonstrating the foregoing, he must then establish a reasonable probability that, but for appellate counsel's failure to raise the issue, the defendant would have prevailed on appeal.[97]

**Motion to Withdraw**

On February 19, 2021, assigned Rule 61 counsel filed a Motion to Withdraw as Postconviction Counsel pursuant to Superior Court Criminal Rule 61(e)(6). Superior Court Criminal Rule 61(e)(6) provides that:

> If counsel considers the movant's claim to be so lacking in merit that counsel cannot ethically advocate it, and counsel is not aware of any other substantial ground for relief available to the movant, counsel may move to withdraw. The motion shall explain the factual and legal basis for counsel's opinion and shall give notice that the movant may file a response to the motion within 30 days of service of the motion upon the movant.

In the motion to withdraw, Rule 61 counsel represented that, after undertaking a thorough analysis of the record to evaluate the Defendant's claims, counsel has determined that the claims are so lacking in merit that counsel cannot ethically

---

[96] *Ploof*, 75 A.3d at 832.

[97] *Neal* at 947.

17

advocate any of them.[98]  Counsel further represented that, following a thorough review of the record, counsel was not aware of any other substantial claim for relief available to the Defendant.  Rule 61 counsel represented to the Court that there are no potential meritorious grounds on which to base a Rule 61 motion and has therefore sought to withdraw as counsel.[99]

In order to evaluate Perkins' Rule 61 motion and to determine whether his Rule 61 counsel's motion to withdraw should be granted, the Court should be satisfied that Rule 61 counsel made a conscientious examination of the record and the law for claims that could arguably support Perkins' Rule 61 motion.  In addition, the Court should conduct its own review of the record to determine whether Defendant's Rule 61 motion is so totally devoid of any, at least, arguable postconviction claims.[100]

With this backdrop in mind, the Court turns to Perkins' specific postconviction claims.

---

[98] DI 115-118. (*See* Motion to Withdraw as Counsel along with the accompanying Memorandum in Support of Motion to Withdraw and Appendix).

[99] *Id.*

[100] *Matos v. State*, 2015 WL 5719694, *2 (Del.).

18

# PERKINS' RULE 61 CLAIMS

In his initial Rule 61 Motion, Perkins asserts six claims for relief as follows:

(1)     **Ground One:  <u>Ineffective Assistance of Counsel</u>**.  In his first claim, Perkins alleges that counsel failed to prepare a defense, failed to provide him with discovery until 18 days before trial, and failed to communicate with him.

(2)     **Ground Two: "<u>Perjury in the First Degree.</u>"**  In his second claim, Perkins alleges that the State's witnesses provided false testimony.

(3)     **Ground Three: <u>Prosecutorial Misconduct.</u>**  Perkins contends that the State mislead the jury and was untruthful during trial.

(4)     **Ground Four: "<u>Use of False Evidence.</u>"**  Perkins argues that because some of his clothing was never tested for DNA that the use of that clothing by the forensic consultant in his testimony was tantamount to providing false evidence.

(5)     **Ground Five: <u>Violation of His *Miranda* Rights.</u>**  Perkins contends that the "police did not explain it was a law for me to not answer questions until I had my counsel present when they interviewed me."

(6)     **Ground Six:  <u>Violation of the Rules of Professional Conduct</u>.**  Perkins contends that trial counsel violated Section 1.4(a)(4) of the Delaware Rules of Professional Responsibility by failing to promptly comply with his requests for legal information before trial and during his direct appeal.

Through his supplemental *pro se* filings, Perkins further elaborates on his initial claims and raises additional claims of ineffective assistance of trial counsel. Those claims regarding the purported failings of trial counsel can be fairly summarized to include the following:

(i) failing to impeach or otherwise object to the testimony of certain police officers at trial;[101]

(ii) failing to file a motion to suppress the clothing he was wearing that was not tested for DNA and/or failing to present evidence that some of the clothing he was wearing was not tested for DNA;

(iii) failing to call a voice authentication expert to testify that the voice on the 911 call was not Perkins' voice;

(iv) failing to cross examine the officer who testified regarding the 911 call with a transcript of the call "allowing the jury to see that there was inconsistency with his statement";

(v) failing to object to the testimony of Thomas Underwood;

(vi) failing to refute the statements about the Defendant having a venereal disease; and

(vii) failing to move to suppress evidence taken from Perkins at the time of his arrest because the Defendant was taken into custody without a warrant in violation of his Fourth and Fourteenth Amendment rights.

---

[101] Perkins claims that Detective Bucksner made false statements during his August 26, 2015 preliminary hearing. DI 167, 169.

Perkins further contends that appellate counsel was ineffective for failing to raise each of the prosecutorial misconduct, "perjury" and suppression claims in his appeal.[102]

For the reasons set forth below, all of the claims raised in Perkins' Rule 61 Motion are either procedurally barred or without merit.

---

[102] In his *pro se* Brief in Support of Motion for Postconviction Relief pursuant to Superior Court Criminal Rule 61, dated November 15, 2022, Perkins seems to abandon certain claims and/or attempts to whittle down the foregoing into five claims as set forth below:

Claim One – Petitioner's rights under the United States and Delaware Constitutions were violated by trial counsel's failure to investigate, failure to move to suppress and present evidence of Detective Bucksner['s] false statements made during Petitioner's August 26, 2015 preliminary hearing;

Claim Two – Petitioner was deprived of a fair trial because the State knowing[ly] presented and/or failed to correct false testimony at his trial; to the extent trial counsel could have objected and presented evidence of prosecutorial misconduct an[d] perjury in the first degree;

Claim Three – Petitioner's rights under the United States and Delaware Constitutions were violated by trial counsel's failure to investigate and arrange for a voice expert to attend Petitioner's trial allowing the use of false evidence to be presented;

Claim Four – Petitioner's rights under the United States and Delaware Constitutions were violated by trial counsel's failure to object to Thomas Underwood['s] testimony and failure to request a self-serving instruction where State's witness had offenses that were never explored; and

Claim Five – The cumulative effect of two or more of the above-described violations of Petitioner's rights deprived Petitioner of a fair trial and, thus, due process of law under the United States and Delaware Constitutions.

DI 168 at i-ii. Rather than treat the foregoing five claims as the only operative ones, the Court has addressed all claims it was able to discern from Perkins' numerous *pro se* filings for completeness.

# ANALYSIS OF PERKINS' POSTCONVICTION CLAIMS

### A. Ground One: Ineffective Assistance of Counsel and Ground Six: Violation of Section 1.4(a)(4) of the Delaware Rules of Professional Conduct

Perkins contends in ground one of his initial Rule 61 Motion that trial counsel (i) failed to prepare a defense, (ii) failed to send him discovery until 18 days before his trial commenced and (iii) failed to communicate with him.[103] Similar to the third allegation, ground six contends that trial counsel failed to "promptly comply" with Perkins' reasonable requests for legal information before trial and during his appeal in violation of Section 1.4(a)(4) of the Delaware Rules of Professional Conduct.[104] Because of the similarity between the ineffective assistance of counsel claims and the claim regarding the violation of the professional rules of conduct, ground one and ground six will be addressed together.

### 1. Failure to Provide a Defense

Perkins' claim that counsel failed to prepare a defense for trial is a conclusory statement that is legally insufficient to prove an ineffective assistance of counsel claim.[105] Accordingly, the claim should be dismissed.

---

[103] A802, A807.

[104] A803, A808. Rule 1.4(a)(4) provides that "A lawyer shall promptly comply with reasonable requests for information." Del. Prof. Cond. R. 14.

[105] *See Jordan v. State*, 1994 WL 466142, at *1 (Del. Aug. 25, 1994) (holding that conclusory allegations are legally insufficient to prove ineffective assistance of counsel) (citing *Younger*, 580 A.2d at 556).

Notwithstanding the foregoing, the record does not support Perkins' claim. After consultation with the Defendant, trial counsel pursued an identify defense as Perkins asserted that he was not the individual who killed Jaime Murphy.[106] Trial counsel hired a private investigator to attempt to substantiate Perkins' claim that another person at Canby Park killed Ms. Murphy and he merely came upon her after the attack, but the private investigator found no evidence to support his allegations.[107] Despite the lack of evidence to support these assertions, trial counsel nevertheless argued in both his opening and closing statement that Perkins was not the killer.[108] Counsel introduced the possibility that Perkins may have tried to help Ms. Murphy in order to explain the reason Perkins was covered in her blood.[109]

To further try to establish reasonable doubt, trial counsel also questioned witnesses about other people who were seen in Canby Park that day as well as the other 911 calls that were placed around the park area in the early morning hours of July 23, 2015.[110] Another 911 call was placed seven seconds after the one placed

---

[106] A82, A86-87, A101-04, A108, A120-22, A123-25. *See also* Appendix to State's Response to Defendant's *Pro Se* Motion for Postconviction Relief, Counsel's Motion to Withdraw, and Defendant's Response to Motion to Withdraw at 90-91) (All references to the Appendix provided by the State are hereinafter referred to as "B___").

[107] B90.

[108] A218-19, A656, A658.

[109] *Id.*

[110] A599-610; A378-81.

from Ms. Murphy's cell phone and, based on this evidence, trial counsel presented the jury with the theory that the other caller could have been the killer.[111]

The record reflects that trial counsel prepared and presented Perkins' chosen defense, despite the overwhelming evidence against him presented by the State. The fact that the chosen strategy did not yield an acquittal does not make trial counsel's performance legally ineffective under *Strickland*.

### 2. Failure to Provide Discovery Until 18 Days Before Trial

Perkins alleges that trial counsel was ineffective for failing to provide him with discovery until 18 days before trial.[112] This claim is without merit because trial counsel was complying with the protective order issued by the Court.

Pursuant to Superior Court Criminal Rule 16(d), "the court may at any time order that discovery or inspection be denied, restricted, or deferred, or make such other order as is appropriate."[113] Rule 16(d) permits the Court to issue a protective order that limits a defendant's ability to review certain discovery material.[114] In this case, the Court issued a protective order that prevented trial counsel from disclosing

---

[111] A382-88; A659-62.

[112] A802; A807.

[113] Del. Super. Ct. Crim. R. 16(d).

[114] *State v. Melton*, 2018 WL 3096636, at *2 (Del. Super. June 21, 2018).

identifying information regarding witnesses to Perkins, his family or associates without leave of Court.[115] Even though Perkins did not receive certain discovery until close to trial, the State provided trial counsel with that discovery to be used in preparation for trial. Trial counsel, however, was bound by the Court's order.

The Delaware Supreme Court has made clear that a defendant cannot establish a case for ineffective assistance of counsel under *Strickland* based on trial counsel's failure to provide the defendant with discovery materials where a protective order prevents him from doing so.[116] As such, Perkins has failed to show that counsel's actions in providing discovery within 18 days of trial falls below an objective standard of reasonableness. Nor has he established prejudice. Perkins fails to identify any information contained in the discovery that would have aided his defense had he personally received it sooner. His claim is without merit.

### 3. Failure to Communicate

Perkins alleges that trial counsel failed to communicate with him and did not promptly comply with his requests for legal information.[117] Like his claim for failure

---

[115] A78.

[116] *State v. Melton*, 2018 WL 3096636, at *2 (Del. Super. Ct. June 21, 2018); *see also State v. Lewis* 2018 WL 5843464, at *6-7 (Del. Super. Ct. Nov. 5, 2018).

[117] A802-03, A807-08.

to prepare a defense, this statement is conclusory and fails to meet either prong under *Strickland*.[118] Moreover, the record reflects that this assertion is factually untrue.

Trial counsel communicated with Perkins at court appearances, through letters, and in-person meetings.[119] Trial counsel reviewed the evidence with Perkins on numerous occasions.[120] Discussion took place regarding trial strategy[121] and, immediately prior to trial, counsel communicated with Perkins regarding witness statements that implicated him in the killing as well as all the evidence the State intended to present at trial.[122] The notion that trial counsel failed to "respond promptly" is likewise not reflected in the record. Perkins may have wanted responses more quickly from his counsel but nothing in the record suggests that they were derelict in their duty.

Mere allegations of failing to communicate are insufficient under *Strickland*. Perkins must demonstrate how counsel's performance was deficient and show that he suffered prejudice as a result. He has failed to do either.

---

[118] *See McNeill*, 2016 WL 5940323, at *5 (holding that vague allegations that trial counsel failed to communicate with the defendant did not meet the standard necessary to show that trial counsel's performance fell below an objective standard of reasonableness or that defendant was prejudiced).

[119] *See e.g.* B97-98, B103, B150-51, B156.

[120] A102-04.

[121] B89-91, A82, A86-86, A101-05, A108, A120-25.

[122] B90-91.

**B. Ground Two: Perjury in the 1ˢᵗ Degree;**
**Ground Three: "Prosecutorial Misconduct" and**
**Supplemental Ineffective Assistance of Counsel**
**Claims Related Thereto**

In his initial Rule 61 Motion, Perkins asserts without any support in ground two that the State's witnesses swore falsely and gave false statements during their testimony.[123] In ground three, he likewise makes the conclusory statement that the prosecution misled the jury with "untruthfulness" during trial.[124] As best as can be discerned, Perkins attempts to expand on these claims in his subsequent *pro se* filings by providing some specificity regarding the purported perjury and prosecutorial misconduct.

Perkins conducts a painstaking review of the aspects of the record he deems to be inaccurate or untruthful statements. He attempts to point out inconsistencies between prior statements and testimony at trial and argues that the prosecution was aware of these inconsistencies and allowed the witnesses to perjure themselves and, in so doing, engaged in prosecutorial misconduct. Perkins takes particular issue with the testimony of Detective Bucksner, who Perkins' claims provided false testimony by (i) testifying inaccurately at Perkins' preliminary hearing about a number of

---

[123] A802, A807.

[124] A802, A807.

27

subjects including, but not limited to, Underwood's statements to him about Perkins' intentions with respect to Ms. Murphy as well as the blood observed by Underwood on Perkins' fingers after the murder; (ii) testifying that when Perkins was taken into custody he had blood on his grey long-sleeve t-shirt, dark blue t-shirt and orange sweatpants, which Perkins claims is contradictory to the testimony of another officer and (iii) testifying at trial inaccurately about the statements made by the male voice on the 911 call.[125] Perkins further contends that the statements made by Detective Bucksner at the preliminary hearing constitute perjury because Underwood stated during his police interview on the day of the murder that Perkins was going to "beat her up" but did not say Perkins intended to kill her.[126] He further claims that the State committed prosecutorial misconduct by not correcting the alleged false testimony and perjury of which he claims the State was aware.[127] Perkins then claims that trial counsel was ineffective for not impeaching Detective Bucksner's credibility and both trial and appellate counsel were ineffective for failing to raise the perjury and prosecutorial misconduct claims.[128]

---

[125] B80-82; A83-88, DI 167.

[126] B84-85, DI 167 at (i), 3-5. Detective Bucksner testified at Perkins' preliminary hearing held on August 26, 2015 as follows: "The witness also stated that on July 22nd they had a conversation with Perkins in which Mr. Perkins stated he was going to kill Murphy." A41.

[127] B80-82, B83-88, DI 167.

[128] *Id.*

However, the direct claims asserting false statements, perjury and prosecutorial misconduct are procedurally barred under Rule 61(i)(3) for failing to raise them in the proceedings leading to his judgement of conviction.[129] To overcome this bar, Perkins would have to demonstrate (i) cause for relief and prejudice from the violation of his rights[130] or (ii) that an exception applies pursuant to Rule 61(i)(5). With respect to the latter, Perkins makes no challenge based on jurisdiction, offers no new evidence of his actual innocence or a new rule of constitutional law that would overcome this procedural default.[131] As to the former, he cannot demonstrate cause for relief or prejudice because the ineffective assistance of counsel claims relating to the purported perjury and prosecutorial misconduct fail on the merits.

Trial counsel acted reasonable under the circumstances and was not ineffective for failing to object to alleged instances of perjury and prosecutorial misconduct because the record does not support those allegations. Under Delaware law, a person commits perjury if he "swears falsely."[132] "A person 'swears falsely'

---

[129] *See Ruffin v. State*, 2019 WL 719038, at *2 (Del. Feb 19, 2019) (holding that claims of prosecutorial misconduct not raised on direct appeal are procedurally barred under Rule 61(i)(3)); *see also Reeder v. State*, 2006 WL 1210986, at *2 (Del. May 3, 2006) (holding that perjury claims raised for the first time on a motion for postconviction relief are procedurally barred under Rule 61(i)(3)).

[130] Super Ct. Crim R. 61(i)(3).

[131] Super Ct. Crim R. 61(d)(2)(i) and (ii).
[132] 11 Del. C. §§ 1221-1223.

when the person intentionally makes a false statement . . . knowing it to be false or not believing it to be true, while giving testimony under oath. . ."[133] Discrepancy alone is not enough to prove perjury and mere contradictions in witness testimony "may not constitute knowing use of false or perjured testimony."[134] Rather, such contradictions are credibility questions for the jury.[135]

Nothing in the record indicates that Detective Bucksner intentionally lied at any stage of the proceedings. Detective Bucksner testified at Perkins' preliminary hearing that two witnesses advised him that the Defendant "constantly talked about harming" Ms. Murphy and Perkins further told one witness that "he was going to kill Murphy" the day before her murder.[136] Underwood likewise testified at trial that Perkins stated that he was going to kill Ms. Murphy if she gave him a venereal disease.[137] Trial counsel recognized that Underwood's trial testimony was inconsistent with the statement he gave to police on the day of the murder in which Underwood indicated that Perkins was going to "beat her up" but did not use the

---

[133] 11 Del. C. § 1224.

[134] *Romeo v. State*, 2011 WL 1877845, at *3 (Del. May 13, 2011); *Lambert v. Blackwell*, 387 F.3d 210, 249 (3d Cir. 2004).

[135] *Romeo*, 2011 WL 1877845, at *3.

[136] A41, A28.

[137] A312, A317, A322.

word "kill."[138] Counsel successfully admitted Underwood's prior statement under 11 Del. C. § 3507, but under cross examination, Underwood insisted that he had told Detective Bucksner that Perkins said he was going to kill Ms. Murphy.[139] Detective Bucksner later testified that he did not recall Underwood telling him during the interview that Perkins was going to kill Ms. Murphy but did recall Underwood stating that Perkins was going to harm Ms. Murphy if she gave him a venereal disease.[140]

These inconsistencies do not establish perjury but rather are credibility questions left to the jury. Moreover, given that trial counsel had the prior statement admitted into evidence and cross examined the witnesses about these allegedly inconsistent statements, trial counsel was the antithesis of deficient. Trial counsel did precisely what was expected of him under such circumstances.

Likewise, there is no credible claim for perjury with respect to the testimony given by Detective Bucksner regarding the 911 call. Perkins claims that Bucksner committed perjury because he testified that the male voice on the 911 call referred to himself as "G" during the killing.[141] It appears that the transcript of the 911 call

---

[138] A320-21, B43.

[139] A322.

[140] A330-321.

[141] A578.

prepared by O'Rourke Investigative Services at the request of defense counsel does not show the male speaker identifying himself as "G" in the text.[142]  However, the jury was not shown the transcript of the 911 call, but rather, heard the actual 911 call numerous times and were free to draw their own conclusions regarding what the male voice said during the call.[143]  In light of the foregoing, the Court cannot conclude that trial counsel was ineffective for failing to cross examine Detective Bucksner with an unofficial transcript of the 911 call.  Nor can Perkins show prejudice for trial counsel's failure to cross examine Detective Bucksner with that transcript given that Perkins' probation officer identified him as the male voice on the 911 call.

Based on the record, all of Perkins' claims regarding perjury and prosecutorial conduct are without merit.  Counsel is not obligated to assert meritless or frivolous claims.  Moreover, there is no reasonable probability that the outcome of the trial would have been different if such claims had been raised given the overwhelming nature of the evidence against the Defendant.

---

[142] A173-75, B105-09, B159-64.  The transcript referenced by Perkins in his Rule 61 Motion was not an exhibit used during trial by either side.

[143] A205-06, A365, A394.  *See Weston v. State*, 2001 WL 265964, at*10 (Del. Mar. 7, 2001) ("Inconsistencies in testimony alone are insufficient to establish the State's knowing use of perjury, 'especially where, as here, the jury as been exposed to all inconsistencies.'").

**C. Ground Four: "The Use of False Evidence" and
Supplemental Ineffective Assistance of Counsel
Claims Related Thereto**

In his fourth claim, Perkins takes issue with the "forensic consultant producing clothing evidence that was never tested for DNA."[144]  He seems to argue that because certain clothing evidence that the forensic consultant testified about was not tested for DNA, the use of such evidence at trial is tantamount to "the use of false evidence."[145]  As a free-standing claim, Perkins' "use of false evidence" assertion is procedurally barred under Rule 61(i)(3) because he failed to raise it in the proceedings leading to his conviction and, as such, should be summarily dismissed.

In his subsequent *pro se* filings, however, Perkins attempts to couch the same "use of false evidence" argument into one of ineffective assistance of counsel by claiming that trial counsel was ineffective for failing to (i) present evidence that some of his clothing was not tested for DNA; (ii) object to police testimony that his blue shirt and keychain had blood stains on them; (iii) object to police testimony that he was wearing orange sweatpants over his blood stained blue sweatpants; and (iv)

---

[144] A808, A803.

[145] A808, A803; B80-82, B83-88.

33

file a motion to suppress with respect to certain evidence.[146] As previously discussed, he similarly appears to claim that the 911 call constituted the "use of false evidence" because he disputes that the male voice on the call was his and takes issue with the testimony of his probation officer who identified his voice.[147] Perkins goes on to assert that trial counsel was ineffective for failing to investigate and arrange for a voice expert to refute that evidence and testify that the voice on the 911 call was not his.[148] As claims for ineffective assistance of counsel, these "false evidence" claims are meritless.

**DNA claims**

The State called two witnesses with respect to the DNA evidence: (i) Sarah Lindauer, a forensic DNA analyst for the State of Delaware and (ii) Paul Kish, a private forensic consultant and blood stain pattern analyst. Numerous swabs and physical evidence were submitted for DNA testing and Lindauer created a report which documented the evidence she tested and the results.[149] Specifically, she tested each of the following items for the presence of blood: (i) the keychain with knife; (ii) long-sleeve thermal t-shirt; (iii) blue sweatpants; (iv) Timberland boots; (v) the

---

[146] B80-82, B83-88.

[147] B83-88.

[148] B83-88; DI 168.

[149] A181-89.

two McDonald's cups and straws; (vi) nail clippings; (vii) hand swabs and (viii) a swab from the playground safety panel for blood.[150]

Following the preliminary testing for the presence of blood, Lindauer tested a number of the items for DNA, including the knife blade, boot stains, McDonald's cup stains, McDonald's cup straws, long-sleeve thermal t-shirt stains and blue sweatpants.[151] One of the McDonald's cup had Ms. Murphy's DNA on it and the other had both Murphy's and Perkins' DNA on it.[152] The blood stain on the long-sleeve thermal shirt produced a mixed DNA profile of at least two individuals from which Perkins was excluded but Ms. Murphy was included.[153] The blood stain from the blue sweatpants and left boot produced mixed DNA profiles of at least two individuals with Ms. Murphy being a major contributor.[154] The blood on the knife blade found in Perkins' pocket at the time of his arrest produced a single source profile that was consistent with Ms. Murphy's DNA profile, as did the blood stain on one of Perkins' boots.[155] The knife handle swab produced a mixed DNA profile

---

[150] A475-76.

[151] A477-90.

[152] A478, A482-83.

[153] A484-85, A495.

[154] A485-89.

[155] A478-81.

of at least three individuals from which Ms. Murphy was excluded but Perkins was a possible contributor.[156]

Perkins seems to argue that the State was required to test every piece of his clothing for DNA in order to use it as evidence at trial but that is not the law. "Delaware law does not require that the State perform any specific testing on the physical evidence it gathers."[157] Nor was trial counsel deficient for failing to present evidence that some of his clothing was not tested for DNA given that Lindauer testified with specificity regarding which items were tested for DNA.[158]

Nor can Perkins establish prejudice for counsels' failure to do so. The clothing and knife were recovered from Perkins' person at the time of the arrest. The DNA tests were to determine whether the blood stains belonged to Ms. Murphy not to determine whether the clothing belonged to Perkins.

The State did not elicit "false evidence" through the testimony of the police officers or Kish because each testified regarding what they personally observed with respect to the physical evidence. The officer who collected the clothing worn by Perkins at the time of his arrest testified that there *appeared* to be dried blood on the

---

[156] A485.

[157] *Dennis v. State*, 2013 WL 1749807, at *3 (Del. Apr. 23, 2013 (citing *Anderson v. State*, 1999 WL 504332, at *3 (Del. Mar. 18, 1999).

[158] A473-97.

keychain, knife blade, long-sleeve thermal t-shirt, blue t-shirt, blue sweatpants and boots.[159] The fact that the blue t-shirt, which Perkins was wearing under the long-sleeve thermal t-shirt, was not tested for blood or DNA does not mean that the police officer cannot testify to what he observed. Trial counsel would have no basis to object to such testimony.

Likewise, Kish testified regarding his observations after examining the orange sweatpants for blood stains. The fact that the orange sweatpants were not tested for blood or DNA does not prohibit Kish, a blood stain pattern analyst, from testifying regarding what he observed on the orange sweatpants. As such, Kish's testimony does not constitute "false evidence." The same is true for the arresting officer who testified that Perkins was wearing orange sweatpants over his blue sweatpants at the time of his arrest. He observed "blood all over the blue sweatpants" when he pulled the orange sweatpants down slightly and saw "a bunch of blood, fresh blood, [not] dried up blood," in Perkins' pocket.[160] The officer's testimony regarding his observations does not constitute "false evidence" and, again, trial counsel would have no basis to object to such testimony.

---

[159] A400-10.

[160] A353.

Finally, trial counsel would have had no basis to file a motion to suppress with respect to the blue sweatpants, long-sleeve thermal t-shirt or McDonald's cups. Perkins seems to believe that the DNA report proved that his DNA was not found on any of the foregoing items, but that is factually incorrect.

**911 call**

The issue regarding the admissibility of the testimony of Perkins' probation officer regarding his identification of Perkins' voice on the 911 call was previously adjudicated by this Court and is therefore barred by Rule 61(i)(4).[161] No Rule 61 exceptions apply.

Nor has Perkins established that trial counsel was ineffective for failing to refute the testimony of the probation officer with an expert witness in the field of voice analysis. Perkins asserts that expert testimony would have "prove[d] the use of false evidence, since John French is the only witness claiming it's my voice who isn't a voice expert and I claim it is not my voice."[162]

There is no dispute that Delaware Rule of Evidence 901(b)(5) provides that a witness may provide voice identification "based on hearing the voice at any time under circumstances that connect it with the alleged speaker" including "firsthand

---

[161] B66-79; A90.

[162] B83-88.

38

or through mechanical or electronic transmission or recording."[163] Opinion testimony about the identity of a speaker is permissible if the moving party can show that the witness has, at some point, heard the voice of the alleged speaker.[164] Here, it is undisputed that the probation officer was familiar with Perkins' voice from speaking with him in person or by phone on a weekly basis over the course of approximately six months.[165] His experience with Perkins was sufficient to identify him in the audio recording of the 911 call and, as such, his testimony was properly admitted by the Court.

This Court had determined that the decision not to call a witness to provide conflicting voice identification testimony is well within trial counsel's discretion.[166] In this case, the decision not to call a voice identification witness fails under *Strickland* because it is unlikely that such a witness would have changed the result of the trial. Even without the testimony of Perkins' probation officer, a reasonable jury could have reached the conclusion that the male voice on the 911 call was Perkins from the other evidence presented at trial.

---

[163] D.R.E. 901(b)(5).

[164] *See Vouras v. State*, 452 A.2d 1165, 1169 (Del. 1982).

[165] A393-96.

[166] *See State v. Anderson*, 2021 WL 1424302, at *12 (Del. Super. Apr. 12, 2021).

Again, the jury heard the audiotape of the 911 call and heard the speaker refer to himself as "G." Underwood testified that he knew Perkins as "G" and he met Perkins through a mutual friend who was known as "Jimmy."[167] The male speaker also makes reference to a "Jim" on the 911 call. In addition, after his arrest, Perkins was interviewed by Detective Bucksner and portions of the recorded interview were played for the jury.[168] So, in this case, the members of the jury had the opportunity to hear the Defendant's voice firsthand. A reasonable jury was capable of putting these pieces together and concluding that Perkins was the male voice on the 911 call without the voice identification testimony of the probation officer.

## D. Violation of *Miranda* Rights: "To Remain Silent"

Perkins contends that the "police did not explain it was a law for me to not answer questions until I had my counsel present when they interviewed me."[169] This claim is procedurally barred under Rule 61(i)(3) because Perkins failed to raise it at any earlier stage of the proceedings.[170] It is also factually inaccurate.

---

[167] A310-12, A576.

[168] A581.

[169] A808, A803.

[170] Nor does Perkins assert any exception applies pursuant to Rule 61(i)(5). He makes no claim regarding lack of jurisdiction, cites no new rule of constitutional law nor presents any new evidence of his actual innocence. *See* Super. Ct. Crim. R. 61(d)(2), (i)(5).

Prior to questioning on July 23, 2015, Perkins was read his *Miranda* rights by the Wilmington police and effectively waived those rights.[171] The record reflects that the detective recited the well-known phrase verbatim:

> *You have the right to remain silent*. Anything you say can and will be used against you in the court. You have the right to speak with an attorney and have him or her present while being questioned. If you cannot afford to hire an attorney, one will be appointed to represent you if you wish. Do you understand the rights I've just explained to you?[172]

In response thereto, Perkins stated "yes."[173] The detective then inquired as to whether Perkins wanted to speak with him in view of these rights and he again responded in the affirmative.[174]

Perkins' waiver was voluntary, unequivocal, and made with the full awareness of the right being abandoned and the consequences of doing so.[175] Contrary to Perkins' assertion, a defendant need not consult with counsel prior to waiving his rights.[176] This claim is procedurally barred and has no merit.

---

[171] A133.

[172] A133 (emphasis added).

[173] A133.

[174] A134.

[175] *See Rambo v. State*, 939 A.2d 1275, 1278-79 (Del. 2007) (explaining the two necessary components of a proper waiver of *Miranda* rights).

[176] *Bryan v. State*, 571 A.2d 170, 176 (Del. 1990).

**E. Additional Ineffective Assistance of Counsel Claims Raised *Pro Se***

Perkins raises three additional claims for ineffective assistance of counsel in his supplemental filings. First, Perkins claims that trial counsel was ineffective for failing to refute the statements regarding his having a venereal disease.[177] Second, Perkins claims that trial counsel was ineffective by failing to seek a jury instruction regarding the veracity of Underwood's testimony in light of his criminal past.[178] Third, Perkins claims that trial counsel was ineffective for failing to file a motion to suppress on the grounds that he was taken into custody without a warrant in violation of his Fourth and Fourteenth Amendment rights.[179] Both of these claims are without merit.

### 1. Venereal Disease

Perkins asserts that trial counsel was ineffective for failing to refute the statements about his having a venereal disease by presenting evidence from laboratory reports taken while he was at the Department of Corrections which stated his test results were "basically within normal limits."[180] This claim misses the mark.

---

[177] B83.

[178] D167.

[179] B83-88.

[180] B99-102, B152-55. The laboratory tests to which the Defendant refers were taken at the Department of Corrections on August 20, 2015 and May 3, 2016, but the exact nature of what the Defendant was tested for is unclear from the documents presented. The only thing that can be discerned is that whatever the tests were for that his results were "basically within normal limits."

Evidence was presented at trial through Underwood's testimony, that in the days leading up to the murder of Jaime Murphy, Perkins was angry with her because he believed she had given him a venereal disease.[181] Perkins told Underwood if she had, in fact, given him a venereal disease that he was going to harm her.[182] Perkins also advised the police that he developed a rash after having sex with Ms. Murphy the week before her death and sought treatment at Christiana Hospital related to the rash just two days before Ms. Murphy was killed.[183] Perkins' medical records from Christiana Hospital were admitted into evidence at trial and confirmed he was treated for exposure to a sexually transmitted disease[184]

Perkins' belief that Ms. Murphy had given him a venereal disease was presented by the State as his motive for the killing. None of the evidence presented at trial established that Perkins had, in fact, contracted a venereal disease. The fact that Perkins may have tested "normal" after the date of the murder has no bearing on his belief or state of mind at the time of murder. Trial counsel would have had no logical basis upon which to introduce the results of the laboratory tests taken

---

[181] A312-13, A317, A321, A567.

[182] A312-13, A317.

[183] A136, A150-54, A157-58.

[184] A583-84, State Ex 75.

while the Defendant was incarcerated. It cannot be said that the failure to do so was objectively unreasonable nor was Defendant prejudiced by that failure.

## 2. Failure to Request Proper Jury Instruction

Perkins contends that trial counsel was ineffective for failing "to object to Thomas Underwood['s] testimony and failure to request self serving instruction where State's witness had offenses that were never explored." Based on the foregoing, it seems that Perkins' believes that trial counsel should have further explored Underwood's criminal past to impeach his credibility on cross examination and then request a jury instruction that would caution the jury regarding the credibility of his testimony.[185]

On direct examination, the State asks Underwood if he was ever convicted of (i) failure to register as a sex offender in each of 2012 and 2015 and (ii) a sex offense loitering charge in 2017.[186] Underwood admits to the failure to register convictions

---

[185] D167 at 37-38. Perkins asserts that trial counsel should have requested the following jury instruction in accordance with *Hoffa v. United States*, 385 U.S. 293, fn14 (1966): "You should carefully scrutinize the testimony given and the circumstances under which each witness as testified, and every matter in evidence which tends to indicate whether the witness is worthy of belief. Consider each witness' intelligence, his motives, state of mind, his demeanor and manner while on the stand. Consider also any relation each witness may bear to either side of the case . . . All evidence of a witness whose self-interest is shown from either benefits received, detriments suffered, threats or promises should be considered with caution and weighed with care."

[186] A313.

and seemingly to the loitering conviction.[187]  The record does not reflect any further inquiries into these matters by trial counsel.

Perkins argues "had counsel requested and the jury been given proper instruction they would have been fully aware of why a perfect stranger would testify falsely about a murder case."[188]  Perkins' claim regarding lack of a proper jury instruction is without merit.  The jury was adequately instructed on how to consider and assess the credibility of witnesses.[189]  The Court instructed the jury on how to consider conflicting testimony of witnesses, to assess the credibility and the weight to be given their statements, and to assess the motivations and interests of the witnesses.[190]  The fact that the Court did not use the exact words set forth in *Hoffa v. United States* does not render the instruction improper.

Perkins also seems to contend that counsel was ineffective for failing to impeach Underwood by further cross examining him regarding his past crimes.  The jury was aware of Underwood's crimes because the State brought them to light on direct examination and, as such, could consider such facts in accessing his

---

[187] *Id.*

[188] DI 167 at 37.

[189]  A693-95.

[190] *Id.*

credibility. It is not clear to the Court how much value would have come from any further questioning of Underwood by defense counsel in that regard.

The decision as to whether or not to call a witness, and how to examine and/or cross examine a witness is a tactical decision.[191] Great weight and deference is given to tactical decisions made by trial counsel and there is a strong presumption that defense counsel's conduct constituted sound trial strategy.[192] Perkins has failed to overcome this strong presumption as he has failed to establish that the outcome of the trial would have been different as a result of any alleged shortcoming of trial counsel in the cross examination of Underwood.

### 3. Motion to Suppress Evidence Obtained at Time of Arrest

Perkins contends that trial counsel was ineffective for failing to move to suppress the use of the evidence obtained at the time of his arrest and that appellate counsel was likewise ineffective for failing to raise this issue on direct appeal.[193] Perkins asserts he was taken into custody without a valid warrant in violation of his Fourth and Fourteenth Amendment rights because at the time he was taken into

---

[191] *Outten v. State*, 720 A.2d 547,557 (Del. 1998).
[192] *Strickland,* 466 U.S. at 689 (1984).

[193] B83-88, DI 167.

46

custody the search warrant was not executed.[194]  Accordingly, he argues that the evidence was illegally seized.[195]  This contention is also without merit.

The record reflects that the police had probable cause to arrest Perkins based on the evidence it had established linking Perkins to Ms. Murphy's death and to search him incident to that arrest.  Trial counsel recognized the same and advised Perkins' that there was no colorable basis for filing a motion to suppress.[196]  An ineffective assistance of counsel claim based on the failure to file a motion is without merit if trial counsel lacked a legal or factual basis to do so.[197]  Likewise, appellate counsel cannot be deemed ineffective for failing to raise a meritless issue on appeal.

Under the facts and circumstances of this case, both appellate and trial counsel's actions were objectively reasonable.  Even if those actions were somehow judged to be unreasonable, there is no reasonable probability that, but for those actions, the result of trial or Perkins' direct appeal would have been different.

---

[194] A29-30.  Perkins was arrested at approximately 5:30 p.m. (or 1730 hours) and the search warrant was not executed until 7:57 p.m. (or 1957 hours).

[195] B87-88, DI 167.

[196] B98.

[197] *State v. Exum*, 2002 WL 100576, *2 (Del. Super.), *affirmed*, 2012 WL 2017230, *1 (Del.).

## CONCLUSION

The evidence presented at trial implicating Perkins in the death of Jaime Murphy was overwhelming. It included, among other things, (i) an audiotape of the 911 call made from the victim's phone during the attack on July 23rd in which her killer's voice is heard and then identified as being Perkins' voice at trial, (ii) surveillance video of the victim and the Defendant together the evening before she was killed, (iii) DNA evidence of the victim found on the murder weapon and Perkins' clothes and (iv) witness testimony implicating Perkins in the crime and establishing motive. The Court finds no professional errors on the part of trial or appellate counsel much less any errors that would meet the exacting standards set forth in *Strickland* or otherwise convince the Court that the trial cannot be relied on as having produced a just result.[198]

Perkins has failed to establish that either his appellate counsel or trial counsel were deficient in any regard or that he suffered actual prejudice as a result thereof. The Court has reviewed the record carefully and has concluded that Defendant's Rule 61 motion is without merit and devoid of any other substantial claims for relief. The court is also satisfied that appointed Rule 61 counsel made a conscientious effort

---

[198] Having found no meritorious claims for postconviction relief, the Court need not address Perkins' claim based on "the cumulative effect of two or more of the . . . violations of petitioner's rights." DI 167 at 39-40.

48

to examine the record and the law and has properly determined that Perkins does not have a meritorious claim to be raised in his Rule 61 motion.

For all of the foregoing reasons, Perkins' Motion for Postconviction Relief should be **DENIED** and Rule 61 counsel's motion to withdraw should be **GRANTED**. Any and all other motions related to the Rule 61 Motion filed by the Defendant and not previously ruled upon by the Court are hereby **DENIED**.

**IT IS SO RECOMMENDED.**

/s/ Janine M. Salomone
The Honorable Janine M. Salomone

oc:  Prothonotary
cc:  Carolyn S. Hake, Esquire
     Patrick J. Collins, Esquire
     Kimberly A. Price, Esquire
     Anthony A. Figliola, Jr. Esquire
     Gary Perkins (SBI #285925)